IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 1:17-cv-01233-LTB

ALLEN D. SMITH,

       Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

       Defendant.

---

## ORDER

---

Plaintiff, Allen D. Smith, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for supplemental security income, filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument would not materially assist me in the determination of this appeal.

After consideration of the parties' briefs, as well as the administrative record, I AFFIRM the Commissioner's final order.

## I.    STATEMENT OF THE CASE

Plaintiff seeks judicial review of SSA's decision denying his application for supplemental security income. Compl., ECF No. 1. The application was initially denied on April 7, 2014. [Administrative Record ("AR") 163] The Administrative Law Judge ("ALJ") conducted an evidentiary hearing on July 27, 2015 and issued a

written ruling on January 12, 2016. [AR 15–82] In that ruling, the ALJ denied Plaintiff's application on the basis that he was not disabled because, considering his age, education, and work experience, he had the residual functional capacity to perform jobs that exist in significant numbers in the national economy. [AR 28]  The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making SSA's denial final for the purpose of judicial review. [AR 1–3]  *See* 20 C.F.R. §416.1481.  Plaintiff timely filed his complaint with this court seeking review of SSA's final decision.

## II.    FACTS

### A. Background

Plaintiff is a 43 year-old man who has a sixth-grade education with no specialized vocational training. [AR 49, 251, 258] He has held a variety of jobs, including mechanic, dishwasher, lift operator, truck driver, and tour guide. [AR 258]

Plaintiff previously applied for, and was denied, supplemental security income and disability insurance benefits in 2003, 2004, 2005, and 2007. [AR 237–38, 251–53] In Plaintiff's September 2003 application for supplemental security income, he claimed an alleged onset date of March 2003. [AR 237] In Plaintiff's most recent application—the subject of this opinion—Plaintiff alleged an onset date of February 1992. [*Id.*]

### B. Relevant Medical History

In 2007 Plaintiff began to see Heather Rohrer, M.D. at Sutton Place Behavioral Health, Inc. for a psychiatric re-evaluation. [AR 343] Plaintiff had

moved and had last been to the clinic in 2005. [*Id.*] Dr. Rohrer found Plaintiff to be "mildly fidgety but pleasant and cooperative with the exam. He was alert and oriented [and his] thoughts were logical and goal-directed." [*Id.*] He was referred to Dr. Rohrer "by his outpatient therapist due to [a] 'long history of mental health problems (Bipolar/Manic/Anxiety) and substance abuse issues.'" [*Id.*] He complained of increased anxiety and paranoia and possible delusions. [*Id.*] In part, Dr. Rohrer assessed Plaintiff as having recurrent major depressive disorder and polysubstance dependence in early remission. [AR 344] She prescribed a trial of Cymbalta to "hopefully target both his depressive symptomology and chronic pain." [AR 345]

Over the next ten months, Plaintiff saw Dr. Rohrer seven times. [AR 337–45] Dr. Rohrer consistently noted Plaintiff's paranoia, diagnosed him with schizoaffective disorder, and prescribed Abilify to combat "psychotic symptomology." [AR 337–41] The paranoia manifested in connection with Plaintiff's concern that his family members laced his food with drugs, that he heard people's thoughts, and felt under investigation or under surveillance. [*Id.*] In addition, Plaintiff at times exhibited suicidal thoughts, but denied any intent. [AR 338–39, 341] Dr. Rohrer did note that Plaintiff was cooperative and his affect was euthymic or full-ranged in each medical progress note. [AR 337–42]

In December 2012, Plaintiff saw Kelli Eberhardt, P.A.C. at Mountain Family Health Centers concerning a bloody nose that occurred because he thought "he may have ingested glass while trying to smoke marijuana with a glass pipe." [AR 429] He was further concerned that "he was given an unwanted drug in [a] marijuana

bowl he was smoking with a family friend[.]" [*Id.*] He reiterated a "long history of being drugged by methamphetamines by members of his family[.]" [*Id.*]

Less than a week later, Plaintiff returned, stated he did not feel better, and was "very concerned that he was given marijuana that was laced with something toxic[.]" [AR 426] The report read that a urine drug screen was only positive for cannabinoid. [*Id.*] Plaintiff again visited Mountain Family Health Centers concerned, among other ailments, with the marijuana he had smoked, although there did not appear to be any actual adverse physical effects diagnostically proven. [AR 413–32]

Plaintiff was referred to Peter Stubenrauch, M.D. in the pulmonary division at National Jewish Health for further evaluation on his symptoms. [AR 372] Dr. Stubenrauch stated that Plaintiff's findings "on the pulmonary function studies are certainly interesting in that he does have findings most consistent with fixed extrathoracic obstruction coupled with his hoarseness," and considered "whether he has a paralyzed vocal cord [as] inhalational injuries do not typically cause this." [AR 374] Over the course of a few months, Dr. Stubenrauch noticed that Plaintiff's hoarse voice improved, but referred him for further cardiology testing. [AR 366–71] The cardiologist noted that Plaintiff's concerns regarding the inhalation was "fairly abrupt in onset and fairly abrupt in resolution." [AR 362]

In January 2014, Plaintiff called the Jefferson Center for Mental Health and wanted "testing to find out what is wrong with him." [AR 468] He noted that he was told he had attention deficit disorder, but did not "endorse symptoms consistent

with psychosis." [*Id.*] Plaintiff stated he was applying for social security disability insurance and needed documentation. [*Id.*] The person taking the call noted that "[a]s we spoke he made it clear that he is wanting as many [diagnoses] as possible on paper so that he can be approved for SSA." [*Id.*] Plaintiff stated that "the more I have on paper, the better my chances." [*Id.*]

Plaintiff received therapy from a variety of counselors at Jefferson Center for Mental Health over the next ten months. [AR 464–79, 518–43] In his initial meeting, Plaintiff complained of a struggle with bipolar disorder, post-traumatic stress disorder, and memory issues. [AR 468] The counselor noted that Plaintiff's appearance, mood, speech, affect, thought process, and motor activity were within normal limits, but his remote and recent memories were poor. [AR 472–73] In the subsequent sessions, Plaintiff spoke of an allergy to smoking and how it triggers anger. [AR 465] He recalled that this may relate to his parents. [*Id.*]

His aversion to cigarette smoke became a recurrent theme. [AR 526, 528–30, 532, 533, 535] Seeing a smoker would make him "physically ill" and he was concerned that he became sick when a smoker spit into his food. [AR 535] During one session, the therapist noted that Plaintiff encountered cigarette smoke when he entered the building and was visibly upset because he had a strong allergy that impacted much of his daily functioning when he was exposed to secondhand smoke. [AR 532] During these sessions, Plaintiff began to make progress and at one point reported that he was feeling hopeful and stated that he was in a good place. [AR 529] Plaintiff also stated he felt "encouraged about possibly getting financial aide

[sic] until his [social security disability insurance] comes in." [*Id.*] At a later session, however, Plaintiff smelled cigarette smoke while camping with his girlfriend and "tore up their tent out of anger." [AR 528] While the therapist noted his mood was depressed, his other mental status characteristics were within normal limits. [*Id.*]

Indeed, at times Plaintiff was depressed, his appearance was disheveled, affect was irritable, mood was anxious, thought process was obsessive, and his motor activity was restless. [AR 525, 526, 532] However, the majority of the time, Plaintiff was cooperative with the therapeutic process and his mental status was within normal limits. [AR 466, 522–24, 527, 529–31, 533, 535] He was diagnosed as having bipolar disorder throughout his therapy. [AR 466–75, 519–43] Progress reports throughout his therapy considered his issues with depression, cigarette smoke, the effectiveness of medications, and that his mental status is generally within normal limits. [AR 536–43] Plaintiff appeared to have last visited Jefferson Center for Mental Health in November 2014 when he and his therapist decreased the frequency of his sessions. [AR 522]

Concurrent to his time in therapy at Jefferson Center for Mental Health, Plaintiff saw Francine Andrews, M.D. regarding "chronic respiratory symptoms with acute worsening around smoke." [AR 507] Plaintiff eventually received a CT scan and a variety of medicines for the issue. [AR 511–17] Dr. Andrews noted that Plaintiff "has seen improvement but is still having significant problems especially with overheating and exposure to even small amounts of second hand smoke." [AR 514]

Additionally, in the early stages of his time in therapy at Jefferson Center for Mental Health, a counselor at a separate company providing vocational assistance to Plaintiff referred him to David Benson, Ph.D. for a psychological evaluation. [AR 435] The background information and individual interview of Plaintiff by Dr. Benson reiterated prior points, including Plaintiff's plan to apply for social security disability insurance; his aversion to secondhand smoke caused by childhood trauma from his parents; ongoing suicidal thoughts without an apparent intent to harm himself; and paranoia, but no hallucinations. [AR 435–37]

Plaintiff was evaluated on the Wechsler Adult Intelligence Scale—Fourth Edition by Dr. Benson and was found to have a full scale composite score of 70, which placed him in the borderline range of intellectual functioning. [AR 438] In reviewing Plaintiff, Dr. Benson noted that Plaintiff

> came to the evaluation wearing a dirty baseball cap and a soiled sweatshirt. He was socially awkward and anxious. During the testing he gave up easily and put forth little effort, and often would not continue even with encouragement. His scores fall around the Borderline range of intellectual functioning, with moderate variation. He has particular deficits in areas which require working memory, such as mental math, along with deficits in tasks that require visual motor speed and coordination. Based on his performance here, he will be challenged in tasks above the unskilled level. A basic dilemma is that the type of tasks for which he would typically qualify are ones which he physically cannot do at this point. He will have a hard time understanding the world around him and will have trouble dealing with complex life problems with which he is now faced.

[AR 439]

In conducting the Wide Range Achievement Test, Dr. Benson noted that Plaintiff's "scores are within a range that would be expected," but the "math is not reported here because it appears that he only answered a few questions without

really trying and then quit." [AR 440] Dr. Benson's diagnostic impression was DSM-V; schizoaffective disorder, bipolar type; characteristics of an attention deficit disorder; borderline intellectual functioning; and cannabis abuse. [AR 441] He noted that it was critical that Plaintiff maintain participation in mental health treatment, that he is extremely volatile, and that there was a possibility of self-harm or decompensation. [AR 442]

Around the same time as Dr. Benson's evaluation, Plaintiff received a consultative exam from Ronald Jendry, M.D. [AR 443] Under general observations, Dr. Jendry noted that Plaintiff was "a thin fellow who appears in no distress, very friendly[,] can hear me well and answers articulately." [AR 444] Dr. Jendry diagnosed Plaintiff with: (1) degenerative disc disease of the spine; (2) a history of brain injury with some cognitive disorder and ADD; and (3) spurring in the anterior hips. [AR 447]

In April 2014, state agency psychologist Douglas Hanze, Ph.D. evaluated Plaintiff and reviewed his medical record. Dr. Hanze found that Dr. Benson's finding of Plaintiff having an IQ of 70 was not valid because of his other achievement scores and Plaintiff's daily activities, which Dr. Hanze noted as being able to handle self-care, make simple meals, do chores, go out alone, drive, shop, use a checkbook, socialize, and follow spoken instruction. [AR 151–52] However, Dr. Hanze noted severe affective disorder, borderline intellectual functioning, and "ADD/ADHD." [AR 152] Dr. Hanze found mild restriction of activities of daily living, moderate difficulty in maintaining social functioning, moderate difficulty in

maintaining concentration, persistence, or pace, and no episodes of decompensation. [AR 152–53]

In the mental residual functional capacity assessment, Dr. Hanze found that Plaintiff has concentration problems and difficulty around others, but that he could "follow simple instructions, sustain ordinary routines and make simple, work related decisions," and can "work with supervisors and coworkers if contact is not frequent or prolonged." [AR 156–57]

### C. Hearing Testimony

Plaintiff's hearing occurred on July 27, 2015. [AR 36] The ALJ first examined medical expert Hugh Savage. [AR 41] Dr. Savage determined that Plaintiff had the severe impairments of sinusitis, low back pain, and asthma. [AR 43–44] Dr. Savage was unclear as to the degree of severity of sinusitis and asthma based on the medical records he reviewed, but found Plaintiff to have minimally severe degenerative disk disorder related to the low back pain. [AR 43–45] Dr. Savage posited that none of Plaintiff's impairments met or equaled any impairments described in the listing of impairments. [AR 45–46]

Dr. Savage found the following limitations or restrictions resulting from Plaintiff's impairments: Plaintiff could sit, stand, or walk for six hours of an eight hour day with normal breaks; no limits on hand or foot activity; Plaintiff could climb ladders, ropes, and scaffolds occasionally; could climb stairs, ramps, balance, stoop, kneel, crouch, or crawl limited to frequently; no limits to hearing or vision; and that Plaintiff should avoid concentrated exposure to unprotected heights, moving mechanical parts, dust, odors, fumes, and pulmonary irritants. [AR 46–47]

Plaintiff testified, first concerning his education level. [AR 48] Plaintiff explained his problems with math and memorization and how that has affected his employment. [AR 50–51] There was a discussion concerning his aversion to cigarette smoke. He stated he has had the aversion since he was a young child and thought his reaction to cigarette smoke was a form of PTSD. [AR 49, 52] He explained that in the presence of cigarette smoke he would get ill, panic, or become angry. [AR 51] He stated he accosted people who were smoking or people on whom he smelled cigarette smoke. [*Id.*] He stated that he regularly had to leave stores if he smells cigarette smoke and that his girlfriend shopped for him. [AR 51–52]

Plaintiff explained that he thought his mother put drugs in his food growing up as a form of revenge because he "told the wrong people about drug use and the selling of drugs." [AR 53] He assumed that people would spit in his food in almost any restaurant setting. [AR 53–54]

Plaintiff's representative questioned Plaintiff on his drug use, which included marijuana, heavy drinking, and the use of cocaine and methamphetamine. [AR 54] The use of marijuana was most prominent for Plaintiff, although he had stopped because he knew he should not be doing it and to remain in a relationship. [AR 55]

On further discussion regarding PTSD, Plaintiff stated that he would have nightmares four or five days a week, paranoia that he was under surveillance, and that people could hear his thoughts. [AR 56–57] He thought that his difficulty in remaining employed related to his issue with cigarettes, difficulty in interacting with others, and PTSD. [AR 57]

Plaintiff attributed issues with memory—such that he would need explicit instructions on how to make a frozen pizza—on his attention deficit disorder and bipolar disorder. [AR 58] Plaintiff described the side effects of his medications and the importance of him having a medical kit with inhalers around at all times. [AR 59–60] Plaintiff described his general pain and pain tolerance and estimated that five days a week he would have overly negative days where would just try to rest and clear his head. [AR 61–62] Plaintiff stated that during Dr. Benson's psychometric testing, he became overwhelmed due to his lack of education and, as his representative put it, "basically quit." [AR 64]

The ALJ then examined a vocational expert ("VE"), who found that jobs existed within all of the ALJ's hypothetical constraints. [AR 67–73] Plaintiff's representative added additional constraints to the hypotheticals, some of which the VE found would lead to no competitive employment. [AR 73–76]

Finally, Plaintiff's partner Beverly Lynn Peper was questioned. [AR 76] She confirmed Plaintiff's use of drugs and alcohol, but was convinced he was "clean of anything like extreme alcoholism, cocaine, [or] methamphetamines." [AR 78] Peper additionally stated the difficulties the couple faced because of Plaintiff's sensitivity to cigarette smoke. [AR 79–80] She explained that

> the cigarette smoke and residue is a constant battle daily. Where it goes into -- he truly, truly, truly has a sensitivity to cigarette smoke. I mean he will say someone is smoking, and then perhaps a minute -- a couple seconds or a minute someone will pass us that is smoking. He truly, truly has a strong sensitivity to it.

[AR 81] She continued that if they go to a restaurant and the server had just smoked, they would have to leave and that if the cook had smoked, Plaintiff would

perceive that as being poisoned. [*Id.*]

## III.   LEGAL STANDARDS

### A. SSA's Five-Step Process for Determining Disability

A claimant is "disabled" under Title XVI of the Social Security Act if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). SSA has established a five-step sequential evaluation for determining whether a claimant is disabled and thus entitled to benefits. 20 C.F.R. § 416.920.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 416.920(b). If he is, benefits are denied and the inquiry stops. *Id.* At step two, SSA asks whether the claimant has a "severe impairment"—that is, an impairment or combination of impairments that "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). If he does not, benefits are denied and the inquiry stops. If he does, SSA moves on to step three, where it determines whether the claimant's impairments "meet or equal" one of the "listed impairments"—impairments so severe that SSA has determined that a claimant who has them is conclusively disabled without regard to the claimant's age, education, or work experience. 20 C.F.R. § 416.920(d). If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity

("RFC")—that is, what he is still able to do despite his impairments—and asks whether the claimant can do any of his "past relevant work" given that RFC. 20 C.F.R. § 416.920(e). If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows him to do other work in the national economy in view of his age, education, and work experience. 20 C.F.R. § 416.920(g). In contrast with step five, the claimant has "the burden of establishing a prima facie case of disability at steps one through four." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).

## B. Standard of Review

My review concerns only whether SSA's factual findings are supported by substantial evidence and whether the correct legal standards were applied. *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015). With regard to the law, reversal may be appropriate when SSA either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Kellams v. Berryhill*, 696 F. App'x 909, 911 (10th Cir. 2017). With regard to the evidence, I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).

"Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Razo v. Colvin*, 663 F. App'x 710, 713 (10th Cir. 2016). The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss

every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). I examine the record as a whole and may not reweigh the evidence or substitute my judgment for that of the ALJ. *Razo*, 663 F. App'x at 713.

## IV.    THE ALJ'S RULING

In his ruling, the ALJ noted that two issues were present in the case. The ALJ noted an issue "related to reopening of the determination on the claimant's prior application." [AR 18] The ALJ explained that the current application alleged an onset date during a period previously adjudicated from a prior application. [*Id.*] Thus, the ALJ reasoned that "there is an implied request for reopening of the determination of his prior file." [*Id.*] The ALJ stated that the determination on Plaintiff's prior file "may not be reopened because the request for reopening (the filing of the current application) was not made within two years of the date of notice of the initial determination on the prior Title XVI claim (*See* 20 C.F.R. §§ 416.1488(b), 416.1489)." [*Id.*] The ALJ added that "Social Security Ruling 91-5p was also considered and does not apply in this case." [*Id.*]

The next issue was the analysis of whether Plaintiff is "disabled under section 1614(a)(3)(A) of the Social Security Act." [AR 18] Using SSA's five-step sequential process, the ALJ concluded under the first step that Plaintiff had not engaged in substantial gainful activity since December 18, 2013, his application filing date. [AR 21] Under step two, the ALJ determined that Plaintiff had the "following severe combination of impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the bilateral hips, asthma, sinusitis,

schizoaffective disorder (bipolar type), attention deficit/hyperactivity disorder (ADHD), and borderline intellectual functioning (20 C.F.R. 416.920(c))." [*Id.*]

The ALJ concluded under step three that the enumerated severe impairments did not meet or medically equal a listed impairment deemed to be so severe as to preclude substantial gainful employment. [AR 22] The ALJ focused on a variety of impairments in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (the "Listing"). [AR 22–23] In finding insufficient evidence, the ALJ relied upon the opinion of Dr. Savage and the medical record as a whole. [AR 22–23]

The ALJ found that Plaintiff had the RFC to perform medium work except that he is limited to

> lifting and carrying a maximum of 20 pounds frequently and 50 pounds occasionally; occasional climbing of ramps and stairs and no climbing of ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; no exposure to hazards such as unprotected heights, moving mechanical parts, and operating a motor vehicle; no concentrated exposure to fumes, odors, dust, gases, and poor ventilation; simple, routine, and repetitive tasks; and no more than occasional interaction with supervisors, coworkers, and the public.

[AR 23] In finding this RFC, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." [*Id.*] The ALJ noted the testimony of both Plaintiff and his partner, but found Plaintiff's allegations "not fully persuasive because of his conflicting statements about his ability to sit and his experience of medication side effects." [AR 23–24]

The ALJ explained how the medical record supported his decision by first

looking at Plaintiff's claims of physical pain in the records, the resultant use of medication, and the according diagnoses. [AR 24–26]

In considering Plaintiff's mental impairments, the ALJ noted, "the medical records document a history of treatment for schizoaffective disorder with mild paranoia and good response to medication." [AR 26] The ALJ noted the difference in Plaintiff's appearances between evaluation dates. [*Id.*] Additionally, the ALJ noted Plaintiff "stated that he wanted 'as many [diagnoses] as possible on paper so that he can be approved for [disability benefits],' which diminishes the persuasiveness of his complaints." [*Id.*]

The ALJ noted that an "exam showed soiled clothing, a socially awkward and anxious appearance, and a tendency to give up easily and put forth little effort during testing," but that at a "consultative physical exam performed a few days later, the claimant presented as 'very friendly' [] and at a psychotherapy appointment later that month, he presented with normal mental status." [*Id.*]

The ALJ reviewed Plaintiff's mental status exams and reports between March and November 2014, noting that "[a]lthough he reported that his mood was depressed and that he was 'giving up' in April 2014, [an] exam showed a normal appearance and affect, normal speech, normal thought process and perception, normal motor activity, good insight, and fair judgment." [*Id.*] The ALJ found that Plaintiff's anger and anxiety remained improved in November 2014, when his mental status exam was normal. [AR 27]

The ALJ reasoned that the medical records document "substantial

improvement of the claimant's mood and anxiety symptoms on medication within 12 months of the application filing date and few reports of medication side effects," and "therefore fails to support the alleged severity of the claimant's mental symptoms and limitations." [*Id.*] The ALJ accorded significant weight to the findings of the state agency psychologist "because it is consistent with the medical evidence as a whole documenting substantial improvement of the claimant's psychological symptoms on medication within 12 months of the application filing date, with few complaints and largely normal mental status exams beginning in mid-2014." [*Id.*]

The ALJ accorded little weight to the psychological evaluation performed by Dr. Benson because

> it does not distinguish between the claimant's capabilities in the setting of unskilled tasks versus the setting of more complex or detailed tasks; it is markedly inconsistent with subsequent medical evidence documenting significant improvement of his psychological symptoms within a few months of the psychological evaluation; and it is based, in part, on his alleged physical symptoms and limitations, which were not evaluated by the examining psychologist and are outside his area of expertise.

[*Id.*]

The ALJ found that Plaintiff is unable to perform past relevant work, fulfilling step four. [*Id.*] In the fifth and final step, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. [*Id.*] The ALJ supported his decision based in part by the testimony of the VE, and found that Plaintiff could be a buffet attendant, hand packager, small product assembler, and electronics worker. [AR 29] Thus, the ALJ concluded that Plaintiff is not disabled. [AR 29–30]

## V.    ISSUES ON APPEAL

In appealing the ALJ's decision, Plaintiff argues that the ALJ erred by: (1) denying Plaintiff's motion to reopen his prior claim; (2) not finding that Plaintiff's mental impairments met that of an impairment in the Listing; and (3) improperly determining Plaintiff's RFC.

### A. The ALJ's denial in reopening Plaintiff's prior claim

Plaintiff argues that the ALJ erred by applying an incorrect legal standard when he considered whether to reopen Plaintiff's prior claim for supplemental security income. Pl.'s Br., ECF No. 25 at 4. That earlier claim was denied in 2003 and Plaintiff neither requested timely review of that decision nor requested a timely reopening of that claim. *Id.* at 4–5. In denying the reopening of the prior claim, the ALJ stated that "Social Security Ruling 91-5p was also considered and does not apply in this case." [AR 18]

Plaintiff argues that under Social Security Ruling 91-5p, if a claimant can establish "good cause," SSA allows for the disregard of the regulations on time limits on reopening a claim. ECF No. 25 at 4–6 (citing SSR 91-5p, 1991 WL 208067 (Jul. 1, 1991) (referred to as "SSR 91-5p," *infra*)). Plaintiff continues that good cause may exist if "a claimant presents evidence that mental incapacity prevented him or her from timely requesting review of an adverse determination . . . and the claimant had no one legally responsible for prosecuting the claim. . . ." *Id.* at 6 (quoting SSR 91-5p).

Plaintiff argues that he was mentally incapacitated in 2003 "to the extent that he was not capable of independently pursuing his claim by requesting review."

*Id.* To prove this, Plaintiff points to evidence in the record concerning his mental health problems and intellectual disability. *Id.* at 6–8.

Defendant counters by arguing that I do not have jurisdiction to decide whether an ALJ properly denied a claimant's request to reopen a prior determination. Def.'s Resp., ECF No. 26 at 8. Defendant claims that there is a limited exception to this if "a claimant asserts a colorable constitutional claim," but that the evidence presented to the ALJ did not support that proposition. *Id.* at 9.

### 1. *This court's jurisdiction*

Unless a claimant raises a colorable constitutional claim, a district court has no jurisdiction to review an ALJ's refusal to reopen a claim for disability benefits. *Campos v. Astrue*, 373 F. App'x 880, 882 (10th Cir. 2010) (citing cases). The statute allowing for courts of the United States to review final decisions from SSA, 42 U.S.C. § 405(g), "cannot be read to authorize judicial review of alleged abuses of agency discretion in refusing to reopen claims for social security benefits." *Califano v. Sanders*, 430 U.S. 99, 107–08 (1977). The Court confirms that "the opportunity to reopen final decisions and any hearing convened to determine the propriety of such action are afforded by [SSA's] regulations and not by the Social Security Act." *Id.* at 108. SSA lists the "[d]enial of a request to reopen a determination or a decision" as a determination not subject to judicial review. 20 C.F.R. § 416.1403(a)(5).

However, "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions." *Califano v. Sanders*, 430 U.S. at 109. This

constitutional issue may come in the form of a due process claim if a claimant's "mental position prevented him from understanding his right to appeal the initial denials of benefits in both applications." *Blair v. Apfel*, 229 F.3d 1294, 1295 (10th Cir. 2000). The *Blair* court stated that a "claimant will establish a mental impairment justifying failure to request review 'when the evidence establishes that he or she lacked the mental capacity to understand the procedures for requesting review.'" *Id.* at 1295–96 (citing SSR 91-5p).

SSR 91-5p is a Social Security ruling clarifying SSA policy "on establishing good cause for missing the deadline to request review." SSR 91-5p at *1; *see Silva v. Colvin*, 580 F. App'x 678, 678 (10th Cir. 2014) (under SSR 91-5p "res judicata does not arise from a prior administrative decision if the claimant sought in writing to extend the period for filing a request for review and provided 'good cause for missing the deadline.'"). Good cause may exist if a claimant shows that "mental incapacity prevented him or her from timely requesting review of an adverse determination," thus allowing a prior claim to "be reopened regardless of how much time has passed since the prior administrative action." *Devereaux v. Chater*, 78 F.3d 597, *3 n.5 (10th Cir. 1996) (unpublished table decision) (quotations omitted).

In determining whether a claimant lacked the mental capacity to understand the procedures for requesting review—thereby creating "good cause"—the ALJ "must consider the following factors as they existed at the time of the prior administrative action:

 —inability to read or write;

—lack of facility with the English language;

—limited education;

—any mental or physical condition which limits the claimant's ability to do things for him/herself." SSR 91-5p at *2. If the ALJ does not reopen the case, he or she must state his or her "rationale for not finding good cause and advise the claimant that he or she can file a new application and use the written request for review as a protective filing date." *Id* at *3.

The constitutional due process issue, successful or not, is commonly brought in conjunction with an argument regarding a mental impairment inhibiting a claimant's ability to request review of a case. *E.g. Blair v. Apfel*, 229 F.3d at 1295; *Silva v. Colvin,* 580 F. App'x at 678; *Devereaux v. Chater*, 78 F.3d at *2; *Hanken v. Colvin*, 68 F. Supp. 3d 1342, 1348–49 (D. Colo. 2014); *Smith v. Chater*, 914 F. Supp. 415, 418 (D. Colo. 1996).

Defendant rightly posits that in this context, raising an issue of mental competency does not on its own create a colorable constitutional issue. ECF No. 26 at 9; *Blair v. Apfel*, 229 F.3d at 1296 (ruling that the district court did not commit error when it rejected plaintiff's argument even though plaintiff raised a constitutional issue that "his mental condition prevented him from understanding his right to appeal the initial denials of benefits"); *Devereaux v. Chater*, 78 F.3d at *4 (holding that a due process claim failed on the merits when the ALJ properly analyzed the claimant's mental competency); *London v. Apfel*, 202 F.3d 282 (10th Cir. 1999) (unpublished table decision) (holding that to prove a colorable due

process claim, a claimant must show a mental impairment eroded his ability to pursue his claims).

Plaintiff mentions a due process issue one time, in his Reply, when arguing that Plaintiff's "full rights to due process" were denied. ECF No. 29 at 1. However, there was no additional analysis or citations to case law specific to due process. It appears to be merely mentioned, but not actually rebutted or argued, in the Reply. As a reviewing court, a "brief mention in a reply brief, without the development of the argument, will not preserve an issue." *Paulsen v. Colvin*, 665 F. App'x 660, 667 (10th Cir. 2016) (citing *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996)); *see Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in a reply brief.").

In my review of case law, I could not find an instance in this circuit where a plaintiff succeeded in arguing that error occurred when an ALJ did not properly provide a "good cause" analysis regarding the reopening of a prior determination under the guidance of SSR 91-5p when that plaintiff did not actually analyze a constitutional issue in arguments to the court. *See also Biron v. Apfel*, No. 00-173-P-C, 2000 WL 1771121, at *3, n.4 (D. Me. Dec. 4, 2000) (holding the court cannot review an SSA determination on decisions that would otherwise be final when counsel for plaintiff only made claims based on Social Security regulations and not the Constitution).

The scope of my review is limited to issues adequately presented to me. *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). Since a constitutional

issue was not sufficiently raised, I do not have jurisdiction to analyze whether the ALJ properly acted under SSR 91-5p.

### B. The ALJ's finding that Plaintiff's mental impairments did not meet that of an impairment in the Listing

Plaintiff argues that the ALJ erred by: (1) ignoring substantial evidence regarding Plaintiff's schizoaffective disorder and improperly disqualifying him under Listing 12.03; and (2) incorrectly applied the legal standard when analyzing Plaintiff's borderline intellectual disability under the Listings.

Once a severe impairment is assessed, the ALJ must determine "whether the impairment is equivalent to one of a number of listed impairments that [SSA] acknowledges are so severe as to preclude substantial gainful activity." *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988); 20 C.F.R. § 416.920a. "If the impairment is listed and thus conclusively presumed to be disabling, the claimant is entitled to benefits." *Williams v. Bowen*, 844 F.2d at 751.

To show that an impairment or combination of impairments meets the requirements of a listing, a claimant must provide specific medical findings that support each of the various requisite criteria for the impairment. *See* 20 C.F.R. §416.925; *Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007). If a claimant can show that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits. *Williams v. Bowen*, 844 F.2d at 751; *Lax v. Astrue*, 489 F.3d at 1084.

#### 1. Listing 12.03

At the time the ALJ ruled, Listing 12.03 read

Schizophrenic, Paranoid and Other Psychotic Disorders: Characterized by the onset of psychotic features with deterioration from a previous level of functioning.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one or more of the following:

1. Delusions or hallucinations; or

2. Catatonic or other grossly disorganized behavior; or

3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:

a. Blunt affect; or

b. Flat affect; or

c. Inappropriate affect;

or

4. Emotional withdrawal and/or isolation;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpt. P, App. 1 (2016).

The ALJ found that the criteria of Listing 12.03(B) was not satisfied

in that the claimant's mental impairments have resulted in no more than mild restriction of his activities of daily living based on the lack of

reports of significant difficulties in this area; moderate difficulties maintaining social functioning consistent with his complaints of impulsive anger and irritability, but also the evidence of his good response to medication, his appropriate interaction with treating and examining medical sources, and his ability to maintain his relationship with his significant other; moderate difficulties maintaining concentration, persistence or pace based on testing showing borderline intellectual functioning, but also largely intact mental status exams; and no episodes of decompensation consistent with the lack of evidence of any such episode.

[AR 22] The ALJ further found that the criteria of Listing 12.03(C) was not satisfied

in that the evidence does not demonstrate repeated episodes of decompensation, each of extended duration, such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause decompensation, inability to function outside a highly supportive living arrangement, or complete inability to function independently outside the area of his home.

[AR 22–23]

The ALJ noted that his conclusions on Plaintiff's mental impairments were consistent with the state agency psychological consultant—Dr. Hanze—which the ALJ found "persuasive and accorded substantial weight because it is consistent with the medical evidence of record, which is discussed in detail below" in the ALJ's opinion. [AR 23]

Plaintiff claims that the ALJ did not appropriately support his findings of fact when he determined that Plaintiff did not meet certain criteria in Listing 12.03. ECF No. 25 at 9–14. Namely, Plaintiff argues that the ALJ's decision "does not point to any facts in the underlying record supporting the moderate findings of each of the sub factors or why the ALJ found only moderate limitations." *Id.* at 11. Plaintiff points to evidence in the record he feels is "replete with documentation"

that would qualify Plaintiff under the criteria 12.03(B) or (C) of the Listing. *Id.* at

11–14. Plaintiff argues that "the ALJ seemed to completely ignore the life altering

paranoia surrounding cigarette smoke" that affects Plaintiff, except for the ALJ's

discussion of cigarettes in the context of Plaintiff's respiratory issues. *Id.* at 11, n.3.

In response, Defendant counters that the ALJ sufficiently "discussed the

mental impairment Listings at issue and explained why he found that Plaintiff did

not meet them." ECF No. 26 at 12. Generally, Defendant provides references the

ALJ made to the record that justified his decision. *Id.* at 12–13.

Substantial evidence supports the ALJ's decision in finding that Plaintiff did

not have an impairment equaling that of one in the Listing. In analyzing this issue,

I look at the ALJ's opinion as a whole. *See Fischer-Ross v. Barnhart*, 431 F.3d 729,

733 (10th Cir. 2005) ("[A]n ALJ's findings at other steps of the sequential process

may provide a proper basis for upholding a step three conclusion that a claimant's

impairments do not meet or equal any listed impairment.").  The ALJ provided

support for his findings for each subsection of 12.03(B) and (C).

a. Listing 12.03(B)

Supporting his finding of "no more than a mild restriction of his activities of

daily living"—congruent with 12.03(B)(1)—the ALJ noted a "lack of reports of

significant difficulties in this area." [AR 22] The ALJ referenced Plaintiff's function

report where Plaintiff "said that he can do household chores and hike for 'a long

time . . . .'" [AR 24] Additionally, Plaintiff's answers in his function report show a

variety of activities, including no problems with personal care, preparing his own

meals, and driving a car. [AR 283] This aligns with Dr. Hanze's assessment of Plaintiff's activities of daily living, upon which the ALJ accorded substantial weight. [AR 151]

Supporting his finding of "moderate difficulties maintaining social functioning"—congruent with 12.03(B)(2)—the ALJ noted Plaintiff's "difficulties maintaining social functioning consistent with his complaints of impulsive anger and irritability, but also the evidence of his good response to medication, his appropriate interaction with treating and examining medical sources, and his ability to maintain his relationship with his significant other . . . ." [AR 22] This finding is in part supported by the ALJ's noting that Plaintiff presented as "very friendly" at a consultative psychotherapy exam and the ALJ's summation of mental status exams in 2014 which "demonstrated normal affect and judgment and an alert and oriented presentation." [AR 26]

In addition, Defendants point to the record for instances that accord with the ALJ's findings. ECF No. 26 at 14. While this would usually be a post hoc rationalization, the evidence cited to by Defendant is included in the records that the ALJ cited to in his decision. [AR 26–27]

Supporting his finding of "moderate difficulties maintaining concentration, persistence or pace"—congruent with 12.03(B)(3)—the ALJ noted that Plaintiff had "moderate difficulties maintaining concentration, persistence or pace based on testing showing borderline intellectual functioning, but also largely intact mental status exams." [AR 22] This is supported by the ALJ's analysis of the IQ score and

Plaintiff's mental status exams. [AR 23, 26, 466, 522–24, 527, 529–31, 533, 535]

Supporting his finding of "no episodes of decompensation"—congruent with 12.03(B)(4)—the ALJ noted "a lack of evidence of any such episode." [AR 22] This aligns with Dr. Hanze's findings. [AR 153]

Plaintiff most prominently disagrees with the ALJ's analysis to Plaintiff's aversion to cigarette smoke. ECF No. 25 at 11. While the ALJ in part analyzed the issue under the context of respiratory afflictions, he did not "completely ignore the life altering paranoia surrounding cigarette smoke," as Plaintiff alleges. [AR 25], ECF No. 25 at 11, n.3. The ALJ noted Plaintiff's claim he quit a job because of "fear or exposure to cigarette smoke because of his asthma;" his partner's testimony that Plaintiff decompensates whenever he smells cigarette smoke; and an interaction with a smoker in May 2014. [AR 24, 26]

While the ALJ could have discussed Plaintiff's fear of cigarette smoke in greater detail, I may not "'reweigh the evidence' . . . in order to advance a different view." *Wall v. Astrue*, 561 F.3d 1048, 1069 (10th Cir. 2009) (quoting *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005)) (holding that claimant's extensive medical history supported the ALJ's decision). Plaintiff argues that *Clifton v. Chater* is analogous here. 79 F.3d 1007, 1009–10; ECF No. 25 at 13. In the current case, the ALJ supported his decision with sufficient evidence from the record— namely his analysis of Plaintiff's mental status exams and Dr. Hanze's assessment of Plaintiff—and did not put forth a bare conclusion as occurred in *Clifton*. *See Baldwin v. Barnhart*, 167 F. App'x 49, 53 (10th Cir. 2006) (holding that the ALJ did

not err when, "unlike in *Clifton*, the ALJ [] specifically adopted medical opinions that support[ed] his step-three finding.").

Therefore, I conclude that the ALJ did not err in his determination that Plaintiff did not meet or equal the severity of Listing 12.03(B).

b. Listing 12.03(C)

Plaintiff briefly argues Listing 12.03(C) is also met by the evidence he claims applies to Listing 12.03(B) and his "medical documented history showing his schizophrenic and paranoid disorder lasting far longer than 2 years' duration causing limitations in his ability to do basic work activities." ECF No. 25 at 13.

Defendant states that Plaintiff merely lists the requirements of Listing 12.03(C), but does not tie evidence to those requirements. ECF No. 26 at 15.

Concerning whether Plaintiff has had a medically documented history of schizophrenic, paranoid, or other psychotic disorder of at least two years' duration, there is evidence that this may be the case, which the ALJ referenced (although not as to duration). [AR 26] Plaintiff was found to consistently have paranoia and schizoaffective disorder as early as 2007. [*E.g.* AR 151, 337–41] However the ALJ's failure to further dissect this issue would be harmless error because there is substantial evidence supporting the ALJ's finding that none of the three subsections were met. *Cf. Smith v. Barnhart*, 172 F. App'x 795, 801 (10th Cir. 2006) (holding that reversible error occurred when the ALJ "did not consider § 12.05(C) when he considered whether [plaintiff] met the listings .").

As discussed *supra*, substantial evidence justified the ALJ's finding of no

episodes of decompensation. Thus, the ALJ was reasonable in finding that the requirements of 12.03(C)(1) and (2) were not met.

Plaintiff offers no specific evidence concerning Listing 12.03(C)(3), merely stating that there is "evidence that [Plaintiff] would be incapable of living outside of the highly supportive living arrangement provided to him by [his partner] Ms. Peper." ECF No. 25 at 14. The ALJ's analysis of the mental status exams, where he noted Plaintiff's general improvement with therapy, provided substantial evidence that Plaintiff did not have an inability to function outside of a highly supportive environment. [AR 26–27] In addition, the ALJ found that the evidence as a whole supported the conclusion that Plaintiff was capable of "work with simple, routine, and repetitive tasks and no more than occasional interaction with supervisors, coworkers, and the public." [AR 27] Finally, I agree with Defendant's rebuttal of this claim—to which Plaintiff did not refute in his Reply—that Plaintiff's partner worked 13 hour days three to four days a week, does not constitute a "highly supportive living arrangement," because there was no evidence that he had additional assistance during this time. [AR 77]; ECF No. 26 at 16.

Therefore, I conclude that the ALJ did not err in his determination that Plaintiff did not meet or equal the severity of Listing 12.03(C).

2. *Listing 12.05(C)*

At the time the ALJ ruled, the capsule definition for Listing 12.05 read "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the

developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Pt. 404, Subpt. P, App. 1 (2016). One of the ways to satisfy Listing 12.05 in that iteration of the Listing was 12.05(C), which required a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" *Id.* Another way to satisfy Listing 12.05 in that iteration of the Listing was 12.05(D), which required a

> valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.

*Id.*

In analysis under the third step in the five-step process, the ALJ found that the criteria of Listing 12.05 was not satisfied in that

> the evidence does not document an intellectual disability characterized by significant deficits of adaptive functioning in at least two skill areas as well as a valid verbal, performance or full scale IQ score of 70 or less, as required by section 12.05. While the medical evidence documents a full scale IQ score of 70, that testing resulted in a diagnosis of borderline intellectual functioning rather than intellectual disability . . . .

[AR 22–23]

Plaintiff argues that the ALJ incorrectly applied the legal standards when analyzing Listing 12.05. ECF No. 25 at 14.He argues that since he received a full-scale IQ score of 70, the ALJ should have evaluated the "C" criteria, and if he had done so, substantial evidence in the record existed such that it would apply to

Plaintiff. *Id.* at 14–15.

Defendant counters that the "ALJ recognized that a full scale IQ of 70 appeared in the record," but because the administrating psychologist questioned Plaintiff's effort during the exam, that lead to Dr. Hanze's opinion that the score was not valid. ECF No. 26 at 17. Defendant continues that since a valid score was not in the record, Plaintiff was precluded from meeting Listing 12.05(C). *Id.*

Indeed, the ALJ pointed to Dr. Benson's psychological evaluation, correctly identifying that Plaintiff was diagnosed with borderline intellectual functioning. [AR 23, 441] Further, the ALJ noted that Dr. Hanze confirmed Plaintiff "[g]ave up easily[] and put little effort in testing," and thus he did not find the IQ score valid. [AR 23, 151–52] Plaintiff appears to mistakenly analyze the requirements of 12.05(D) as 12.05(C). ECF No. 25 at 14–16. Alas, this confusion is not mentioned by Defendant and Listing 12.05(C) and (D) both require a "valid verbal, performance, or full scale IQ of 60 through 70." ECF No. 26 at 16–17; 20 C.F.R., Pt. 404, Subpt. P, App. 1 (2016).

Although the ALJ could have explicitly stated that he found the IQ score invalid, he provided clear citations to the record, thereby providing substantial evidence, which state this proposition. *Lax v. Astrue*, 489 F.3d at 1087 (holding that an administering doctor's comments on the validity of an IQ test provided "substantial evidence to support the ALJ's determination that [plaintiff's] IQ scores were not reliable."). Without a valid IQ score in the record, Plaintiff could not meet the requirements of Listing 12.05(C) or (D).

Therefore, I conclude that the ALJ did not err in his determination that Plaintiff did not meet or equal the severity of Listing 12.05.

### C. The ALJ's analysis of Plaintiff's RFC

Plaintiff argues that the ALJ did not properly account for Plaintiff's mental impairments when he formulated Plaintiff's RFC. ECF No. 25 at 16. Plaintiff claims that the only limitations the ALJ factored into his RFC were Plaintiff's mental impairments of "limitations to simple, routine and repetitive tasks and no more than occasional interaction with supervisors, coworkers and the public." *Id.* Plaintiff continues that the limitations found to exist by the ALJ must be added into the hypotheticals presented to the VE. *Id.* at 17. Plaintiff argues that since the ALJ failed to incorporate into his RFC the significant limitations Plaintiff claims exist in the record, the RFC could not be based on substantial evidence. *Id.* at 18.

Defendant counters that Plaintiff did not fully explain how the ALJ's determination was improper; and that the symptoms Plaintiff argues should have been incorporated into the RFC were rightfully discounted and that the ALJ need not address unsupported limitations. ECF No. 26 at 17–19.

At step four, the ALJ must "assess the nature and extent of the claimant's physical limitations and then determine the claimant's [RFC] for work activity on a regular and continuing basis." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999 (quoting *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir.1996)) (alterations and quotations omitted). An RFC assessment is based on what a claimant can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). It is assessed based on all the relevant evidence in the record. *Id.*; SSR 96–8p, 1996 WL 374184, at *5 (July 2,

1996). In formulating an RFC, the ALJ must make specific findings on the record. *Winfrey v. Chater*, 92 F.3d at 1025. Those findings must be supported by substantial evidence. *Haddock v. Apfel*, 196 F.3d at 1088; *see Wells v. Colvin*, 727 F.3d 1061, 1064 (10th Cir. 2013) ("The ALJ's 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence.'") (quoting SSR 96–8p, 1996 WL 374184, at *7) (alterations omitted).

When evaluating the effect a claimant's mental impairment has on his ability to work during the step two analysis, an ALJ must follow a special technique that in part requires "the ALJ to determine whether the mental impairment is 'severe' or 'not severe.'" *Id.* (citing 20 C.F.R. §§ 404.1520a(d), 416.920a(d)). An impairment found to be severe, but not equaling an impairment in the Listing, must still be accounted for in the ALJ's RFC analysis. SSR 96–8p, 1996 WL 374184, at *1 ("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms.").

Plaintiff points to *Hargis v. Sullivan*, 945 F.2d 1482 (10th Cir. 1991) for the proposition that if the VE does not receive an accurate depiction of Plaintiff's mental impairment, the VE necessarily could not provide an accurate employment outlook to the ALJ. ECF No. 25 at 17–18; ECF No. 29 at 4. The crux of this proposition is that testimony "elicited through hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial

evidence . . . ." *Hargis v. Sullivan*, 945 F.2d at 1492 (quoting *Ekeland v. Bowen*, 899 F.2d 719, 724 (8th Cir. 1990)).

This is simply not the case for Plaintiff. The ALJ recognized Plaintiff's alleged limitations in his opinion, but stated that Plaintiff's credibility was diminished because of discrepancies in the record. [AR 24] Additionally, the ALJ discounted the persuasiveness of Plaintiff's complaints because he had stated that he wanted diagnoses for the purpose of being approved for supplemental security income. [AR 26] Finally, as discussed *supra*, the ALJ thoroughly analyzed Plaintiff's mental status exams and made appropriate findings related to those exams.

The ALJ acted properly in not including certain information in his RFC. *See Best-Willie v. Colvin*, 514 F. App'x 728, 737 (10th Cir. 2013) (holding that an ALJ did not err when he failed to include additional limitations in claimant's RFC assessment after disregarding opinions in the record unsupported by medical evidence); *Avery v. Astrue*, 313 F. App'x 114, 123 (10th Cir. 2009) (holding that the ALJ did not err when substantial evidence supported his formulation of Plaintiff's RFC despite claims the ALJ failed to properly consider certain medical records).

Therefore, I conclude that the ALJ did not err in his determination of Plaintiff's RFC.

## VI.   CONCLUSION

ACCORDINGLY, for the foregoing reasons, I AFFIRM the

Commissioner's final order.


Dated: June 22, 2018, in Denver, Colorado.


BY THE COURT:

s/ Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE